**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 20, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

OLADIPO ALABI,

    Defendant - Appellant.

No. 13-2197
(D.C. No. 1:11-CR-02292-JB-1)
(D. N.M)

_____

**ORDER AND JUDGMENT***
_____

Before **PHILLIPS**, **SEYMOUR**, and **MORITZ**, Circuit Judges.
_____

After the United States District Court for the District of New Mexico denied his motions to suppress, Oladipo Alabi entered conditional pleas of guilty to one count each of access device fraud under 18 U.S.C. § 1029(a)(3) and aggravated identity theft under 18 U.S.C. § 1028A(a)(1), retaining his right to appeal the district court's denial of his motions to suppress. The district court imposed a twenty-eight-month prison sentence, and Alabi appealed. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

*    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 6, 2011, New Mexico State Police Officer Chester Bobbitt was standing outside his patrol vehicle, which was parked alongside I-40 in eastern New Mexico, when he heard a noise and noticed a vehicle speeding by him. According to the vehicle's passenger, Oladipo Alabi, Bobbitt made eye contact with Alabi, who is black, before running and jumping into his car to pursue the vehicle Alabi was riding in. Bobbitt then initiated a traffic stop based on the vehicle's expired tags. Although Bobbitt suggested at a later hearing that he initially pursued the vehicle because it was speeding, he did not note the alleged speeding violation in his report, and he gave the vehicle's driver, Kehinde Oguntoyinbo, a warning only for the expired tags. Oguntoyinbo also is black.

After giving Oguntoyinbo the warning and telling him he was free to leave, Bobbitt secured Oguntoyinbo's permission to search the vehicle. The ensuing search yielded a list containing the names, addresses, telephone numbers, birthdates, and social security numbers of hundreds of people; multiple laptop computers and cellular telephones; and more than $1,500 in Wal-Mart gift cards. Bobbitt arrested both men on suspicion of identity theft, searched their wallets, and discovered thirty-one credit and debit cards. While the majority of the cards appeared to belong to Alabi or Oguntoyinbo, five of the cards bore the names of other individuals.

The next morning, Secret Service agents used a Model 5607 Card Verifier to obtain information from the magnetic strips on the backs of the seized credit and debit cards. The agents discovered that the magnetic strips on seven of the thirty-one cards had been re-encoded, *i.e.*, the names and account numbers embossed on the cards did not

match the names and account numbers stored on their magnetic strips. The agents concluded someone had re-encoded the cards with the intent to defraud the issuing financial institutions and the individuals whose account information now appeared on the magnetic strips.

Based on the information gleaned from the cards and the physical evidence Bobbitt discovered during his search of the vehicle, the government obtained a search warrant to examine the cell phones and laptops seized during that search.

A grand jury indicted both men. Alabi moved to suppress all the fruits of the encounter, alleging Bobbitt's racially motivated pursuit of the vehicle violated his equal protection rights under the Fifth and Fourteenth Amendments to the United States Constitution. Alabi also joined in Oguntoyinbo's Motion to Suppress, wherein Oguntoyinbo argued (1) the agents' use of the card reader to obtain information from the credit and debit cards' magnetic strips constituted an illegal search in violation of the Fourth Amendment; and (2) the inclusion of that information in the application for search warrant rendered the warrant invalid.

At the hearing on his motion to suppress on selective-enforcement grounds, Alabi testified Bobbitt made eye contact with him before pursuing the vehicle, and, upon learning Alabi was Nigerian, immediately asked him how many wives he had. Bobbitt maintained he was unaware of Alabi's or Oguntoyinbo's race at the time he decided to pursue their vehicle and testified he did not recall making eye contact with Alabi before the stop. Although Bobbitt admitted to questioning Alabi about how many wives he had, Bobbitt maintained the question was "conversation[al]" and made only after Alabi

3

volunteered information about his second wife.

Alabi also presented evidence drawn from the daily reports of multiple New Mexico State Police officers, including Bobbitt, regarding twenty-three roadside vehicle searches. The searches occurred between January 1, 2011, and June 30, 2011, primarily in the same county where Bobbitt stopped Alabi and Oguntoyinbo. Alabi's investigator testified that based on his visual examination of photographs of the subject drivers, only two of the individuals appeared to be white. Alabi presented no information about the broader population from which the sample of twenty-three drivers was drawn, such as the general demographic characteristics of all individuals driving in that area during the six-month period or the demographic characteristics of the individuals whose vehicles police had stopped, but had not searched.

Alabi also presented the testimony of Alfredo Ramirez, one of the twenty-three drivers whose vehicles had been searched. According to Ramirez, Bobbitt stopped him for violating New Mexico's window-tint statute, gave him a warning for that infraction, searched Ramirez's vehicle without permission, and found nothing. Later, however, Ramirez learned Bobbitt falsely reported finding marijuana during the search.

Finding Alabi's showing of discriminatory purpose insufficient, the district court denied Alabi's motion to suppress on equal protection grounds. The district court based this finding, in part, on its rejection of Alabi's claim he made eye contact with Bobbitt before the stop. Although the district court did not make a specific finding regarding discriminatory effect, it questioned the value of Alabi's statistical evidence given Alabi's failure to present any information about the demographics of the general population from

4

which he drew his twenty-three-driver sample or demonstrate drivers of different races speed with the same frequency.

The district court also denied Alabi and Oguntoyinbo's motion to suppress on Fourth Amendment grounds, finding (1) the agents' examination of the magnetic strips on the credit and debit cards did not constitute a search for Fourth Amendment purposes; (2) even if it was a search, it was reasonable under the circumstances; and (3) alternatively, the evidence gleaned from the cards was admissible under the inevitable discovery doctrine. Finally, the district court concluded the inclusion of the information obtained from the cards in the government's application for the search warrant did not invalidate the warrant, and even if it did, the good-faith exception applied to save the warrant.

After the district court denied his motions, Alabi entered conditional pleas of guilty to one count each of access device fraud under 18 U.S.C. § 1029(a)(3) and aggravated identity theft under 18 U.S.C. § 1028A(a)(1), retaining his right to appeal the district court's denial of both motions to suppress. The district court accepted his pleas and imposed a controlling twenty-eight-month prison sentence.

## DISCUSSION

In this direct appeal, Alabi challenges the district court's denial of both motions to suppress. First, Alabi contends Bobbitt's racially motivated pursuit of the vehicle violated his rights under the Equal Protection Clause, requiring suppression of the fruits of the stop. Second, he argues the agents' warrantless examination of the cards' magnetic strips constituted an illegal search and revealed evidence law enforcement would not have

5

inevitably discovered through lawful means. Finally, he asserts the inclusion of the information from the magnetic strips in the search warrant application rendered the warrant invalid, and the good-faith exception does not apply.

## I.     The district court did not err in denying Alabi's motion to suppress on Equal Protection grounds.

To succeed on his claim of selective law enforcement, Alabi must demonstrate both that Bobbitt was motivated by a discriminatory purpose and that his actions had a discriminatory effect. *See Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003). In the context of Alabi's claim, the former necessarily requires him to show Bobbitt was at least aware of Alabi's or Oguntoyinbo's race at the time he decided to pursue them. *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1265 (10th Cir. 2006) (concluding officer's lack of knowledge regarding defendant's ethnicity at time of stop foreclosed finding of discriminatory purpose). The latter requires Alabi to demonstrate a similarly situated individual of a different race could have been, but was not, pursued under similar circumstances. *See id.* at 1264 (discussing similarities between selective-prosecution and selective-enforcement claims).

In reviewing the district court's rulings, we are mindful of our duty to view the evidence in the light most favorable to the court's denial of the motion and to accept its factual findings unless they are clearly erroneous. *See United States v. Augustine*, 742 F.3d 1258, 1264-65 (10th Cir.), *cert. denied*, 134 S. Ct. 2155 (2014). A finding of fact is clearly erroneous if it lacks support on the record, or if review of all the evidence leaves us with a firm and definite conviction a mistake has been made. *See United States v.*

6

*Cash*, 733 F.3d 1264, 1273 (10th Cir. 2013), *cert. denied*, 134 S. Ct. 1569 (2014).

### A. *Discriminatory Purpose*

Here, the district court denied Alabi's motion based in part on its acceptance of Bobbitt's testimony maintaining he was unaware of Alabi's and Oguntoyinbo's race at the time he decided to pursue their vehicle. In reviewing this finding, we recognize it is not for us to judge Bobbitt's credibility. *See United States v. Donahue*, 442 F.2d 1315, 1316 (10th Cir. 1971) (noting district court determines credibility at hearing on motion to suppress).

Nevertheless, we are troubled by the district court's reliance on its own out-of-court experiment, which purportedly established the inability of passing motorists to make eye contact with law enforcement officers parked alongside I-40 in eastern New Mexico. In its written order, the district court explained,

> The [c]ourt travels on I-40 in eastern New Mexico often, in part because he grew up in Hobbs, New Mexico, and travels to visit family in Dallas. The [c]ourt was on I-40 around Santa Rosa last week, and saw two [New Mexico State Police] cars in the median. The [c]ourt's car was traveling at seventy-five miles per hour, and, of course, looked at the police cruisers. The [c]ourt could did not [sic] have time to make eye-contact with the police officers. The [c]ourt is skeptical of Alabi's story that he locked eyes with Bobbitt. The [c]ourt thus credits Bobbitt's testimony, and finds it more credible that Bobbitt did not know Alabi's race when he gave chase to the Camry, and not until he approached [the] Camry's driver-side window.

Federal Rule of Evidence 201(b)(1) permits a district court to take judicial notice of generally known facts not subject to reasonable dispute. But here, the district court's reliance on its own test of whether it was possible to make eye contact with officers

7

parked alongside I-40 belies any claim the impossibility of doing so is generally known or beyond dispute; if it were, the district court would have had no reason to conduct the experiment.

In any event, we have cautioned against such off-the-record fact-finding because it may place the judge in the role of a witness. *See Lillie v. United States*, 953 F.2d 1188, 1189, 1191-1192 (10th Cir. 1992) (reversing judgment when judge's visit to scene and apparent attempt to recreate scenario resulting in plaintiff's injury may have impacted court's findings); *see also* Fed. R. Evid. 605 (prohibiting a judge from testifying in a trial over which he or she presides).

Further, even if we assume the propriety of the district court's undertaking, the results of its experiment were of limited value. While the district judge apparently attempted to make eye contact with officers seated *inside* their cruisers, Alabi offered uncontroverted testimony Bobbitt was standing *outside* his vehicle when Alabi and Oguntoyinbo passed him. An experiment performed under the former conditions says very little, if anything, about what might transpire during a situation occurring under the latter. *See Navajo Freight Lines v. Mahaffy*, 174 F.2d 305, 310 (10th Cir. 1949) (recognizing even slight change in conditions may so distort results of experiment so as to destroy its evidentiary value).

Finally, we question the soundness of the district court's implied conclusion that the ability of a passenger to make eye contact with an officer is somehow a prerequisite for the officer to determine the passenger's race. Even if the district court's experiment justified its rejection of Alabi's testimony asserting he made eye contact with Bobbitt, it

8

does not follow from that rejection that Bobbitt necessarily was unaware of Alabi's and Oguntoyinbo's race at the time he decided to pursue their vehicle. *See, e.g.*, *Hopkins v. Vaughn*, 363 F. App'x 931, 932 n.1 (3d Cir. 2010) (unpublished) (describing witnesses' ability to discern suspect's race, despite his use of ski mask and gloves, based on "patches" of visible skin).

Ultimately, however, we need not resolve whether the district court's questionable basis for rejecting Alabi's testimony and crediting Bobbitt's compromised its ruling regarding discriminatory purpose. As next discussed, Alabi's failure to make a showing of discriminatory effect, standing alone, is sufficient to defeat his claim.

## B. *Discriminatory Effect*

We have recognized three possible methods of proving discriminatory effect in a selective-enforcement case: statistical evidence; the identification of a similarly situated individual who could have been, but was not, stopped or arrested; and, in certain circumstances, anecdotal evidence establishing an officer's pattern of similar discriminatory behavior. *See Marshall*, 345 F.3d at 1170-71 (suggesting evidence of officer's prior record of racially selective stops and arrests could demonstrate discriminatory effect); *United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001) (discussing use of statistics and identification of similarly situated individual as means of demonstrating discriminatory effect).

Here, Alabi attempted a hybrid approach, collecting information from the daily reports of multiple New Mexico State Police officers, including Bobbitt. From these reports, Alabi compiled a list of twenty-three roadside vehicle searches occurring during

9

a six-month period, twenty-one of which appeared to involve non-white drivers. One of those drivers testified at the suppression hearing, claiming Bobbitt stopped him for a window-tint violation, searched his vehicle, found nothing, and ticketed him for the violation. Later, the driver learned Bobbitt reported finding marijuana in his vehicle, an allegation the driver denied.

But Alabi's statistical evidence is of little use because he failed to present any information regarding the broader population from which he drew the limited sample of twenty-three drivers, such as the demographic characteristics of all individuals driving in the area during the relevant time frame. He also failed to demonstrate drivers of different races speed with the same frequency. *See Marshall*, 345 F.3d at 1168 (explaining statistical evidence in selective-enforcement case must include (1) reliable demographic information, (2) some manner of determining whether the data represents similarly situated individuals, and (3) information about the actual rate of occurrence of the suspected crime across relevant racial groups); *see also United States v. Armstrong*, 517 U.S. 456, 469 (1996) (rejecting presumption, in context of selective-prosecution claim, that people of all races commit all crimes with equal frequency).

Alabi's anecdotal evidence regarding a single stop is similarly insufficient to show discriminatory effect. Alabi failed to identify an individual of another race who could have been, but was not, stopped, and his anecdotal evidence of a single stop did not rise to the level of the evidence in *Marshall*. *See* 345 F.3d at 1162-63, 1170-71. There, this court suggested evidence of an officer's extensive history of stopping predominantly non-white drivers for minor traffic infractions and falsely accusing them of possession of

narcotics may have been sufficient to establish discriminatory effect.

Given Alabi's failure to make a sufficient showing of discriminatory effect, we affirm the district court's rejection of his equal-protection-based claim without deciding whether he made a sufficient showing of discriminatory purpose. *See Alcaraz-Arellano*, 441 F.3d at 1266 (declining to analyze issue of discriminatory effect when defendant failed to show discriminatory purpose); *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1233 (10th Cir. 2000) (explaining court may affirm on any ground supported by record). And because Alabi has failed to demonstrate an equal protection violation, we also need not consider the parties' dispute as to whether suppression is the appropriate remedy for an equal protection violation. *See United States v. Coleman*, 483 F. App'x 419, 421 (10th Cir. 2012) (unpublished) (finding it unnecessary to address whether suppression would have been appropriate remedy for equal protection violation when defendant failed to show such violation occurred). Accordingly, we affirm the district court's denial of Alabi's motion to suppress on equal protection grounds.

## II. The district court did not err in denying Alabi's motion to suppress on Fourth Amendment grounds.

Alabi presents two related Fourth Amendment challenges. First, he argues the district court erred in denying his motion to suppress the information contained on the cards' magnetic strips because the agents' examination of those strips constituted an illegal search, and the evidence was not admissible under the inevitable discovery doctrine. Second, citing the government's reliance on that illegally obtained information in securing a search warrant, he argues the district court erred in refusing to suppress the

evidence obtained from the computers and cellphones. Because resolution of the latter issue is helpful in analyzing the former, we address Alabi's claims in reverse order.

### A. Validity of the Warrant

Even if we assume the agents' act of scanning the cards violated Alabi's Fourth Amendment rights, the government's partial reliance on that information in obtaining a warrant for the devices found in the vehicle is not necessarily fatal. *See United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990) (acknowledging warrant is valid as long as supporting affidavit contains sufficient untainted evidence to establish probable cause, even if affidavit also contains unconstitutionally obtained information).

Standing alone, Alabi and Oguntoyinbo's possession of multiple credit cards embossed with names other than their own and a list containing the names and social security numbers of hundreds of individuals would have caused a reasonably prudent person to believe evidence of a crime, such as the source of this personal information, would be found on the computers and cell phones. *See United States v. Romero*, 749 F.3d 900, 904 (10th Cir. 2014) (explaining probable cause exists when facts would warrant person of reasonable caution to believe evidence of crime will be found at place to be searched); *see also* 18 U.S.C. §§ 1028(a)(7), (d)(7)(A) (possession of name, social security number, or date of birth in connection with unlawful activity constitutes identity theft).

Faced with this evidence, the district court properly determined the government's application contained sufficient indicia of probable cause to issue a warrant, even without the information derived from the cards' magnetic strips.

### B. Examination of the Cards

Finally, Alabi argues his Fourth Amendment rights were violated when the agents extracted the contents of the credit cards' magnetic strips without a warrant. Alabi contends the district court should have granted his motion to suppress because the information the agents obtained would not have been discovered absent the unlawful search.

Again assuming the officers' actions constituted an illegal search, any evidence obtained from the strips nevertheless was admissible under the inevitable discovery doctrine as long as the government demonstrates, by a preponderance of the evidence, that a lawful police investigation would have inevitably discovered the information. *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005).

Here, application of the inevitable discovery exception depends on the likelihood law enforcement ultimately would have discovered the evidence on the magnetic strips pursuant to a valid search warrant. *See United States v. Christy*, 739 F.3d 534, 541 (10th Cir.), *cert denied*, 135 S. Ct. 104 (2014). In *United States v. Souza*, 223 F.3d 1197 (10th Cir. 2000), this court adopted a four-factor test to aid in this determination:

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal [search]; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

*Souza*, 223 F.3d at 1204 (quoting *United States v. Cabassa,* 62 F.3d 470, 473–74, 473 n.2

13

(2d Cir. 1995)) (internal citations omitted).

The government concedes law enforcement had not yet begun the process of obtaining a warrant when agents examined the magnetic strips on the thirty-one credit cards found in Alabi and Oguntoyinbo's possession. Critically, however, the first *Souza* factor is relevant, in part, because it informs the determination of whether the evidence at issue would have remained in place and intact while law enforcement secured the warrant, thus increasing the likelihood of its discovery. *Souza*, 223 F.3d at 1204 (citing *Cabassa*, 62 F.3d at 473). Because the credit cards were safely in police custody when agents examined them, even if the first factor weighs against application of the inevitable discovery doctrine in this case, it does so only slightly. *See Souza*, 223 F.3d at 1204 (treating probability as key issue in determining applicability of inevitable discovery exception and characterizing probability of discovery as high when police had already secured item to be searched, guaranteeing access until warrant issued).

The second factor, the strength of the probable cause showing at the time of the search, weighs in favor of applying the inevitable discovery exception here. As discussed above, Bobbitt's search of the vehicle and the men's wallets turned up more than thirty credit and debit cards, some of which bore the names of other individuals, as well as a list containing the personal identifiers of hundreds of people. Such evidence would cause a person of reasonable caution to believe it likely the magnetic strips on the seized cards contained evidence of a crime or crimes, such as the account numbers of other individuals. *See* 18 U.S.C. §§1029(a)(3), (e)(1) (possession, with intent to defraud, of fifteen or more cards or account numbers that could be used to obtain something of value

14

constitutes access device fraud). This showing of probable cause is strong enough to convince us not just that a magistrate *could* have issued a warrant, but that a magistrate *would have* issued one. *See Cabassa*, 62 F.3d at 473-74 (concluding second factor weighed against government where residual possibility remained that magistrate would have required stronger showing of probable cause).

The government also argues the third factor weighs in favor of applying the inevitable discovery exception because the agents ultimately obtained a warrant, albeit for the electronics rather than for the cards' magnetic strips.[1] But the government provides no authority suggesting the third factor is satisfied if law enforcement simply obtains *any* warrant, rather than a warrant for the evidence it argues would have been inevitably discovered. On the other hand, the fact the agents ultimately sought and obtained a search warrant for closely related items suggests they would have included the cards in their application had they not already examined them. Thus, while this factor does not weigh fully in favor of the government, the agents' act of procuring a warrant to search other items found during the same traffic stop makes it likely the agents would have procured a warrant to search the cards, as well.

Finally, the fourth factor also weighs in favor of the government, as there is no evidence the agents' decision to swipe the cards' magnetic strips was based on a lack of confidence in their probable-cause showing, *i.e.*, was an attempt to "jump the gun."

---

[1] In his brief, Alabi argues, "It is undisputed that the [g]overnment made no efforts to obtain a warrant to search the magnetic strips on the credit/debit cards. Further, it is undisputed that the [g]overnment did not intend to do so." Aplt. Br. at 44. But Alabi does not address the fact that the agents ultimately obtained a warrant for the electronics. Nor does he challenge the district court's conclusion that the third *Souza* factor weighed in favor of the government as a result. Thus, Alabi has waived any such argument on appeal. *See United States v. Wayne*, 591 F.3d 1326, 1336 n.6 (10th Cir. 2010) (explaining appellant's failure to raise argument in opening brief resulted in waiver).

On balance, we conclude the *Souza* factors weigh in favor of applying the inevitable discovery exception. Given this conclusion, we affirm the district court's denial of Alabi's motion to suppress the evidence obtained from the cards without addressing the parties' remaining Fourth Amendment arguments, *e.g.*, whether the scan of the strips constituted a search for Fourth Amendment purposes, and, if so, whether that search was reasonable. *See United States v. Martinez*, 512 F.3d 1268, 1274 (10th Cir. 2008) (declining to address remaining Fourth Amendment arguments when inevitable discovery doctrine applied).

## CONCLUSION

Alabi's failure to make a showing of discriminatory effect directs that we affirm the district court's denial of his suppression motion based on equal protection grounds. Further, we affirm the district court's denial of Oguntoyinbo's suppression motion based on Fourth Amendment grounds, in which Alabi joined. Even assuming the warrantless examination of the credit cards' magnetic strips constituted an illegal search, the warrant application contained sufficient independent indicia of probable cause to support the warrant to search the computers and cell phones, and the evidence obtained from the strips was admissible under the inevitable discovery doctrine.

Entered for the Court
Nancy L. Moritz

Circuit Judge

16